# In the United States Court of Federal Claims

|  |  |
|---|---|
| SOFITC3, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>DELVIOM, LLC,<br><br>*Defendant-Intervenor.* | No. 24-2064<br>(Filed: August 21, 2025)[1]<br>Filed under seal: June 18, 2025<br>Reissued: August 21, 2025 |

*Jeffrey M. Chiow*, *Eleanor M. Ross*, *Timothy McLister*, *Jordan N. Malone*, and *Olivia C. Bellini*, Greenberg Traurig, LLP, Washington, D.C., for Plaintiff.

*Nelson Kuan*, Civil Division, United States Department of Justice, Washington, D.C., and *Robert B. Nelson*, United States Department of Homeland Security, Washington, D.C., for Defendant.

*Elizabeth N. Jochum*, *Samarth Barot*, *Shane Hannon*, and *Amanda DeLaPerriere*, Blank Rome, LLP, Washington, D.C., for Defendant-Intervenor.

## OPINION AND ORDER

**LERNER,** *Judge.*

Plaintiff, SOFITC3, LLC ("SOFITC3"), brings this bid protest against the United States. Defendant, the Department of Homeland Security ("DHS" or "the Agency"), awarded a firm-fixed price contract for cybersecurity services to Defendant-Intervenor, Delviom, LLC ("Delviom"), through a three-phased procurement. For Phase 2, quoters were instructed to demonstrate their Prior Corporate Experience. They described their companies' relevant technical experience for up to three prior separate "engagements." Each engagement needed to have a similar value, size, complexity, and scope to DHS' planned award, and the offeror should have completed each engagement no more than five years before the quote deadline. Based on the offerors' Prior Corporate Experience submissions, DHS provided quoters guidance on whether they should proceed to Phase 3.

---

[1] This Opinion was filed under seal on June 18, 2025. ECF No. 54. The parties jointly proposed redactions. ECF No. 57. Accordingly, the Court reissues this Opinion with the agreed upon redactions, which are noted with bracketed asterisks ([***]).

Regardless of the Agency's recommendation, offerors who submitted proposals under Phase 2 could elect to submit Phase 3 quotes.  In Phase 3 submissions, quoters provided information about their planned Management & Staffing Approach, as well as their Technical Qualifications & Approach.  Defendant then reviewed the submissions as a whole and conducted a best value trade-off analysis to choose a vendor.

SOFITC3 primarily challenges two aspects of Delviom's evaluation during the procurement.  First, it alleges Defendant-Intervenor should have been disqualified under Phase 2 of the procurement because its Prior Corporate Experience quote did not conform to the Solicitation's requirements and contained material misrepresentations.  Specifically, Plaintiff contends one of Delviom's prior engagements impermissibly depicted two prior contracts as one engagement and, consequently, was not similar in value to Defendant's planned award.  Plaintiff maintains the Agency erred in evaluating Delviom's Prior Corporate Experience submission and Delviom knowingly misrepresented the value and duration of its experience.

Second, Plaintiff objects to Defendant's purported unequal treatment in the evaluation of SOFITC3's and Delviom's Phase 3 evaluations.  Together, these allegations serve as the basis for SOFITC3's challenge both to the Agency's best value analysis and its decision to award this contract to Delviom.

Pending before this Court are the parties' respective Motions for Judgment on the Administrative Record, as well as Plaintiff's Motion for a Preliminary Injunction and its Motion to Amend its Reply to its Motion for Preliminary Injunction.  Pl.'s Corrected Mot. for J. on the Admin. R. (hereinafter "Pl.'s Mot."), ECF No. 39; Def.'s Mot. for J. on the Admin. R. (hereinafter "Def.'s Mot."), ECF No. 36; Def.-Intervenor's Mot. for J. on the Admin. R. (hereinafter "Def.-Intervenor's Mot."), ECF No. 38; Mot. for Prelim. Inj., ECF No. 30; Mot. to Am./Correct Reply, ECF No. 44.  For the reasons below, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.  Defendant-Intervenor's and Defendant's Motions for Judgment on the Administrative Record are **GRANTED**.  Plaintiff's Motion for a Preliminary Injunction and its Motion to Amend its Reply to its Motion for Preliminary Injunction are **MOOT**.

I.      **Findings of Fact**

        A.      **The Solicitation**

In August 2024, DHS issued a Request for Quote ("RFQ" or "Solicitation") for cybersecurity services as a set-aside for small businesses.  Tab 15a at AR 719–20.  *See* Tab 66 at AR 2252.  SOFITC3 was the incumbent contractor.  *See* Tab 68 at AR 2272; Tab 62 at AR 2224.  Potential offerors were allowed to submit written questions about the Solicitation.  Tab 15a at AR 722; Tab 13b (Questions & Answers submitted with first amendment).  And the Agency issued several amendments to the RFQ.  Tab 67 at AR 2263–64 (chronicling the changes in each amendment).

The awardee would provide cybersecurity support services to the National Security Cyber Division and the Enterprise Cybersecurity Governance Division in DHS' Chief Information Security Officer Directorate ("CISOD").  *Id.* at AR 739.  Defendant planned to award the contract

2

to the offeror whose quote provided "the best overall value to the Government, considering the technical evaluation factors and price." *Id.* The Federal Acquisition Regulation ("FAR") subpart 8.405 and DHS acquisition guidelines governed the procurement. *Id.* at AR 720.

**B.    Evaluation Criteria**

The Agency conducted this procurement in three phases. *Id.* at AR 722. Quoters submitted separate submissions called volumes for each phase. *Id.* And Defendant "reserve[d] the right to reject and not to evaluate any quote that fail[ed] to comply with the instructions contained" therein. *Id.* The following table illustrates the submission process.

| Phase | Volume/Selections |
|---|---|
| **Phase 1**<br>    **Mandatory Down-Select** | Factor 1: Facility Clearance |
| **Phase 2**<br>    **Advisory Down-Select** | Factor 2: Prior Corporate Experience |
| **Phase 3** | Factor 3: Management & Staffing Approach |
| | Factor 4: Technical Qualifications & Approach |
| | Factor 5: Cybersecurity Readiness |
| | Factor 6: Price |

*Id.* at AR 723.

Under Phase 1, quoters and their subcontractors submitted evidence that they held active Facility Clearance at the Top-Secret level. *Id.* at AR 723, 725. DHS required all offerors to maintain Top-Secret clearance to be eligible for the contract, and it prohibited quoters who did not hold the required clearance from proceeding to Phase 2 of the submission process. *Id.* at AR 725, 734.

Offerors who proceeded to Phase 2 provided the Agency with information about their Prior Corporate Experience. *Id.* at AR 726. "The Quoter, as the Prime Contractor or all Teaming Partners proposed in a Contractor Teaming Arrangement (CTA), shall describe their company's (technical) relevant experience, not older than five (5) years from the quote deadline, in relation to and approach to supporting the DHS [Office of the Chief Information Officer ("OCIO")] CISOD Governance and Compliance requirements." *Id.* Vendors could provide experience "where the quoter performed as the prime contractor or performed as a subcontractor," and the Solicitation directed them to "clearly identify whether they performed as the prime or sub-contractor." *Id.* And offerors could provide information about prior corporate experience performed either by themselves or their subcontractors, so long as the vendors "clearly identify the owner of the prior corporate experience." *Id.* The Solicitation further directed quoters to "[d]escribe [their] prior corporate experience for up to three separate engagements" and "demonstrate prior corporate experience for each engagement roughly equaling $50 million over the past five years (from the quote deadline) with similar size, complexity, and scope" to seven listed substantive technical requirements. *Id.* *See also id.* at AR 734–35.

3

Defendant answered several questions about the Prior Corporate Experience requirement on August 23, 2024 in a Question & Answer session ("Q&A").  *See* Tab 13b.  Two potential quoters asked DHS whether it could confirm if the $50 million requirement was a cumulative total across all engagements or if each individual engagement should be valued at approximately $50 million. *Id.* at AR 551–52.  The Agency responded: "[e]ach engagement (up to three) should be as similar as possible to the government's requirement, which is estimated at roughly $50M over five years."  *Id.* When another potential offeror asked if there were "specific criteria or examples of what is considered 'relevant' for engagements in cybersecurity governance and compliance," DHS answered: "[p]rior corporate experience should demonstrate the capacity of the offeror to manage projects similar in size, scope, and complexity to the contemplated requirement.  The contemplated requirement is estimated to have a cumulative value of roughly $50M over five years."  *Id.* at AR 552.

Another prospective offeror queried: "[w]hen considering prior corporate experience that involves subcontractors, how will the evaluation differentiate between experience led by the prime versus the subcontractor?  Will there be equal consideration, or should there be a heavier focus on the prime contractor's experience?"  *Id.*  DHS answered: "[p]rior corporate experience will be considered holistically.  Offerors are advised to submit prior corporate experience that best demonstrates the combined team's ability to manage an effort of similar size, scope, and complexity."  *Id.*

After reviewing the Prior Corporate Experience submissions, DHS notified the highest-rated offerors that they should proceed to Phase 3 in the submission process.  Tab 15a at AR 726–27. Quoters whom Defendant deemed "unlikely to be viable competitors" were informed of their status and provided a basis for "the Government's advisory recommendation."  *Id.* at AR 727.  DHS' recommendation was only advisory, and quoters could choose whether to proceed to Phase 3.  *Id.* The Agency explained its "advice [would] be *a recommendation only*, and those quoters who are advised not to proceed may elect to *continue their participation* in the procurement."  *Id.* (emphasis added).

Under Phase 3, the Agency reviewed four additional factors: Management & Staffing Approach, Technical Qualifications & Approach, Cybersecurity Readiness, and Price.  *Id.* at AR 727–33.

Under Management & Staffing Approach (Factor 3), quoters provided information about their staffing and retention plans, "ability to establish a workforce and skill mix with the appropriate level of knowledge and experience," and "ability to respond to contractual performance issues and conditions in a timely manner."  *Id.* at AR 727–28.  Offerors then answered the following question: "[d]espite the approach described in your Factor 3 narrative, you are experiencing a high degree of turnover.  How would you approach resolving this problem while minimizing the impact of turnover on your ability to consistently meet the government's requirements?"  *Id.* at AR 729.  The Solicitation explained quoters would be evaluated on the degree of clarity and feasibility of their team's roles and responsibilities, the degree to which their management approach described day-to-

4

day operations, and "[t]he degree to which the quoter demonstrate[d] the [offeror's] ability to recruit, hire, train, and retain well-trained and qualified staff." *Id.* at AR 735.

For Technical Qualifications & Approach (Factor 4), offerors provided their "reasoning and approach to meet the objective of this acquisition as reflected in the [Statement of Work]" in the RFQ. *Id.* at AR 729. They discussed "the understanding of the requirement, its purpose and scope, goals, objectives, and the degree of difficulty in successfully completing the requirements," as well as "potential problems that can be expected to be encountered during the delivery of services and the potential solutions that may mitigate those problems." *Id*.

Price (Factor 6) would "be evaluated to determine if it is fair and reasonable." *Id.* at AR 736. The Solicitation explained quoters should use the Attachment 3 Pricing Template "as a 'guide' designed to assist in developing [their] staffing plan and subsequent price quote." *Id.* at AR 731. "The Government reserves the right to utilize other quote information received from the Offeror to assist in deciding of [sic] reasonableness, including a review of the technical solution and proposed labor categories and hours in comparison to the total proposed price." *Id.* at AR 736. The RFQ explained:

> if the Offeror's quote differs from those in the estimate included in the Attachment 3 Pricing Template, the Offeror is required to provide a detailed explanation for its rationale for all deviations from the Government's proposed labor categories and hours/numbers of [Full-Time Equivalents] for each labor category. The proposed level of effort (i.e. proposed deviated labor categories and associated hours) must be reasonable, feasible, and adequate to accomplish the work to be performed, and the Government's evaluation in this regard will be directly reflected and assessed under Factor 3: Management and Staffing Approach.

*Id.* at AR 731. DHS further clarified that it "may reject an offer as being unacceptable if it is materially unbalanced as to prices for each year of the contract" or "any price quote that is found not compliant with the Solicitation's instructions." *Id.* at AR 736.

After evaluating the six factors, Defendant conducted a best value trade-off analysis considering all the factors in the RFQ. *Id.* at AR 733. The non-price factors were listed in order of importance, and when combined, were more important than price. *Id.* The award would go to "the responsive quoter whose quote represents the best overall value to DHS, price and non-price factors considered." *Id.* To achieve the overall greatest benefit, the Agency explained it may not select the highest-rated quote. *Id.* ("The Government may also award to other than the highest technically rated quote, if the Government determines that a price premium is not warranted."). *Id.* And DHS instructed it would "not make an award at a significantly higher overall price to achieve only slightly superior technical capability." *Id.*

## C.    Prior Corporate Experience Submissions

DHS received twenty proposals for Phase 1 and eighteen for Phase 2. Tab 43b at AR 1511. Delviom and SOFITC3 both submitted Phase 2 quotes. Tab 25 (Delviom's Volume II – Prior Corporate Experience); Tab 27 (SOFITC3's Volume II – Prior Corporate Experience). Delviom

submitted a proposal with a subcontractor, [***] ("[***]"). Tab 25 at AR 918. In contrast, SOFITC3 submitted its proposal as a joint venture between Protégé Softek International, Inc. ("Softek") and Mentor FEDITC, LLC ("FEDITC"). Tab 27 at AR 941.

Defendant-Intervenor listed three prior corporate experiences: contracts with DHS' Federal Emergency Management Agency ("FEMA"), the U.S. Department of Treasury's Office of Intelligence Analysis, and DHS' U.S. Citizenship and Immigration Services ("USCIS"). Tab 25 at AR 919, 923–24. Delviom characterized its FEMA experience as "directly relevant" to the subject procurement. *Id.* at AR 917. It listed two contracts with a total value of $58,451,453, or about $10.7 million a year, and noted this figure included the recompete won under a joint venture, where Delviom was a managing member. *Id.* at AR 923. Defendant-Intervenor listed the FEMA work as prime contractor experience. *Id.*

For FEMA, Delviom "managed [Risk Management Framework] activities for 225 IT systems," "provided compliance support services," and "implemented continuous monitoring strategies, integrating real-time security data into FEMA's existing [Security Information and Event Management] systems." *Id.* at AR 924. To help the agency respond to threats with actionable mitigation strategies and continuously monitor real-time dangers, Delviom provided risk assessments and implemented heat maps and risk registers. *Id.* at AR 925. The proposal noted award performance from September 2021 through March 2027. *Id.* at AR 923.

Delviom also provided information about work with the Treasury and USCIS in its proposal. It was the prime contractor for the Treasury award, which it valued at $40,955,061 or about $10.25 million per year. *Id.* at AR 923. Performance began in July 2023 and would last through July 2027. *Id.* The USCIS work was performed by Delviom's subcontractor, [***]. *Id.* The quote listed the period of performance as September 2018 through December 2020. *Id.* [***]'s experience was worth $39,100,000 or $17.3 million per year. *Id.*

SOFITC3 also provided three prior corporate experiences. Tab 27 at AR 950. It listed engagements with the U.S. Special Operations Command ("USSOCOM") Headquarters and the U.S. Air Force HQ, Air Combat Command, Intel System Security Division. *Id.* And notably, SOFITC3 listed its work as an incumbent on the DHS CISOD contract: the precursor contract to the subject award. *Id.*

SOFITC3 was the prime contractor for the DHS CISOD contract, and it listed the value of the award at nearly $94 million. Tab 27 at AR 950. Plaintiff explained the engagement's substance aligned with the procurement at issue and "directly support[ed] the CISOD, assisting and supporting DHS with accreditation and authorization oversight; cybersecurity risk management; threat and risk management performance analysis and reporting; compliance auditing and assessments; communication and outreach; cybersecurity strategy and implementation consulting; [and] management cybersecurity program oversight." *Id.* Plaintiff enumerated the period of performance as November 2021 through November 2026. *Id.*

SOFITC3 valued the U.S. Air Force award at $78,348,776, with performance beginning in January 2021 and ending in January 2026. *Id.* For this award, FEDITC, the mentor in the SOFITC3 joint venture, was the prime contractor in another joint venture, ASIRTek. *Id.* In its

explanation, Plaintiff wrote: "[w]ork performed by the joint venture members is considered as prime work." *Id.* FEDITC provided the Air Force with cybersecurity support similar to the Solicitation's requirements. *Id.*

For its third experience with USSOCOM, FEDITC was also listed as the prime contractor as part of another joint venture, AlliantCorps, LLC. *Id.* According to SOFITC3, FEDITC was a managing member of that joint venture, and it "performed 100% of the work." *Id.*

### D.     Original Award Decision

DHS issued at least three recommendations advising offerors to proceed to Phase 3, two of which went to Delviom and SOFITC3. *See* Tab 29a (Delviom's Advisory Notice); Tab 29b (Saliense Consulting, LLC's Advisory Notice); Tab 29c (SOFITC3's Advisory Notice). Both Delviom and SOFITC3 submitted proposals for Phase 3 along with ten other offerors. *See* Tab 43b at AR 1511; Tab 44 at 1521. The Agency evaluated the twelve Phase 3 proposals and disqualified nine of the offerors. Tab 40 at AR 1372–74; Tab 77 at AR 2426. The following table reflects appraisals for the three eligible offerors who submitted Phase 3 proposals:

|  | Phase 2 | Phase 3 | | | |
|---|---|---|---|---|---|
|  | Prior Corporate Experience | Management & Staffing Approach | Technical Qualifications & Approach | Cybersecurity Readiness | Price |
| Delviom | High Confidence | High Confidence | Some Confidence | High Confidence | $50,989,194.39 |
| SOFITC3 | High Confidence | Some Confidence | Low Confidence | High Confidence | $54,334,017.97 |
| [***] | Some Confidence | Some Confidence | Low Confidence | High Confidence | [***] |

Tab 40 at AR 1372–74; Tab 77 at AR 2426.

A "High Confidence" score indicated the Agency had "high confidence that the offeror understands the requirement, provides sufficient information, and will be successful in performing the task order requirements." *E.g.*, Tab 74 at AR 2378. A "Some Confidence" rank meant Defendant had "some confidence that the offeror understands the requirement, provides sufficient information, and will be successful in performing the task order requirements." *Id.* And a "Low Confidence" rating indicated DHS had "low confidence that the offeror understands the requirement, provides sufficient information, or will be successful in performing the task order requirements." *Id.*

In its initial evaluation, Delviom earned a "High Confidence score for its Prior Corporate Experience, Management & Staffing Approach, and Cybersecurity Readiness factors." Tab 40 at AR 1372, 1373. And it submitted the lowest priced offer. *Id.* at AR 1376. SOFITC3 received a

"High Confidence" rating only in the Prior Corporate Experience and Cybersecurity Readiness categories. *Id.* at AR 1374. Its Management & Staffing Approach factor received a "Some Confidence" rank, and its Technical Qualifications & Approach submission scored as "Low Confidence." *Id.* Plaintiff's quote was roughly $3 million more than Delviom's price. *Id.* at AR 1376; Tab 77 at AR 2431.

After conducting a best value trade-off analysis, Defendant awarded the contract to Delviom. *See* Tab 77 at AR 2422.

### E.    GAO Protests

On October 10, 2024, SOFITC3 protested Defendant's award decision at the U.S. Government Accountability Office ("GAO"). *Id.*; Tab 53. Rather than proceed, the Agency decided to take voluntary corrective action and reevaluate Delviom's Prior Corporate Experience submission. Tab 77 at AR 2422 (citing Tab 59). On November 12, 2024, GAO dismissed the case over SOFITC3's objections, explaining even if the corrective action did not address all the issues SOFITC3 raised, dismissal was still appropriate. Tab 60 at AR 2083–85. *See generally* Tab 55.

SOFITC3 then brought a new case at GAO. Tab 65 at AR 2247. It objected to the scope of DHS' corrective action alleging (1) since the Agency's corrective action implicitly acknowledged errors with its evaluation of Delviom's quotation under Prior Corporate Experience, similar errors must exist in its evaluation of other offerors; and (2) DHS must eliminate Delviom's proposal because it "proposed no relevant prime contractor experience" in its Prior Corporate Experience volume. *Id.* at AR 2247–48 (citing Tab 60). GAO dismissed the protest because SOFITC3's arguments did not provide "a legally sufficient basis to object to the scope of the agency's corrective action." *Id.* at AR 2248.

Plaintiff then filed a case in the U.S. Court of Federal Claims, again seeking to challenge the scope of Defendant's voluntary corrective action. Compl. at 3–4, ECF No. 1. The Court held a Preliminary Joint Status Conference on December 17, 2024. During that Conference, Defendant agreed to widen the scope of its corrective action and reevaluate both SOFITC3's and Delviom's Prior Corporate Experience submissions. *See* ECF No. 15. The Court stayed the case until the Agency made a new award decision. *Id.*

### F.    Voluntary Corrective Action

The scope of the Agency's corrective action was limited. Defendant reevaluated only Plaintiff's and Defendant-Intervenor's Prior Corporate Experience submissions. *See, e.g.*, Tab 77 at AR 2425. It did not reevaluate any of the Phase 3 factors. *See id.* DHS then reweighed which proposal offered the best value to the Agency, incorporating its new Prior Corporate Experience ratings. *See id.*

The Agency took corrective action because the Technical Evaluation Team ("TET") did not consistently award "strengths" during its original Phase 2 evaluations of Prior Corporate Experience. *Id.* The TET "erroneously assessed some aspects of quotes that simply met requirements, but which did not exceed requirements, or did so in a way that does not add value, as

strengths." *Id.* The Agency determined the TET correctly applied "strengths" in its Phase 3 analysis. *Id.* Accordingly, the Agency only reevaluated the Prior Corporate Experience factor. And since Delviom and SOFITC3 were the only two offerors eligible for award who received strengths, the Agency limited its reevaluation of Prior Corporate Experience solely to those two offerors. *Id.*

### 1.    Prior Corporate Experience

When applied correctly, DHS defined a "strength" as "[a]n aspect of the quote that exceeds the government's stated requirements, adding value to the quote." *Id.* And a "value" was a "[b]enefit to the government at a given cost." *Id.*

During the corrective action, DHS revised Delviom's rating for the Prior Corporate Experience factor. *Id.* While Delviom originally received a "High Confidence" score, the Agency changed that rating to "Some Confidence." *Id.* SOFITC3 retained its "High Confidence" score. *Id.* *See generally* Tab 67. The following table reflects the two offerors' ratings after DHS adjusted only Prior Corporate Experience scores:

| | Phase 2 | Phase 3 | | | |
|---|---|---|---|---|---|
| | Prior Corporate Experience | Management & Staffing | Technical Qualifications & Approach | Cybersecurity Readiness | Price |
| Delviom | Some Confidence | High Confidence | Some Confidence | High Confidence | $50,989,194.39 |
| SOFITC3 | High Confidence | Some Confidence | Low Confidence | High Confidence | $54,334,017.97 |

Tab 77 at AR 2426.

For its renewed best value trade-off analysis, Defendant again only considered Delviom's and SOFITC3's proposals. *Id.* After weighing the relative merits of each quote, the Agency concluded Delviom's proposal offered DHS the best value. *Id.* at AR 2431. SOFITC3's Prior Corporate Experience quote was "qualitatively superior to Delviom's quote." *Id.* Plaintiff received one strength for its implementation of cloud security solutions, which exceeded the RFQ requirement. *Id.* It supplied three technically similar engagements to the contemplated work, and all three of its engagements were "roughly equal in size to the government's standard of roughly $50 M over 5 years." *Id.* at AR 2427–28.

To calculate each project's value, the Agency first determined the engagement's value per year and then the number of days the offeror performed the engagement in the five years prior to the RFQ. *See, e.g.,* Tab 75 at AR 2398; Tab 74 at AR 2383–84. It converted the total number of days into a year value. *See* Tab 75 at AR 2398. Then, DHS multiplied those two numbers to determine the engagement's size. *See id.* The following table shows the TET's conclusions concerning the value of Plaintiff's experiences:

**The TET's Evaluation of SOFITC3's Prior Corporate Experience**

| | Calculated Value per Year | Calculated Duration | Calculated Total Value | Roughly Equal to $50 million? |
|---|---|---|---|---|
| DHS HQ | $18.8 million | 2.8 years | $52.4 million | Yes |
| Air Force | $18.8 million | 3.6 years | $57 million | Yes |
| USSOCOM | $12.7 million | 4.2 years | $53.8 million | Yes |

*See* Tab 77 at AR 2428; Tab 75 at AR 2398–2402.

Turning to Defendant-Intervenor's submission, the Agency explained that all three of Delviom's prior engagements were "technically similar to the contemplated work," especially since two of the contracts dealt with other DHS entities "subject to the same DHS-specific policies and standards as would apply to the contemplated task order." Tab 77 at AR 2427. And Delviom's quote had two strengths gathered from all three experiences. *Id.* But the TET found only the FEMA award to be "*somewhat similar* in size ($31.5M over 3 years)." Tab 74 at AR 2388 (emphasis added).

Given this new information, the TET downgraded Delviom to a "Some Confidence" rating. *Id.* The Agency explained:

> out of the three engagements provided by Delviom in its Factor 2 quote, only one was determined by the TET to be roughly similar in size to the contemplated effort. In its reevaluation, the TET determined that, because they could neither consider *future work*, nor consider work *more than five years prior to release of the RFQ*, the amount of work that the TET could consider was more limited than they found in their initial assessment.

Tab 77 at AR 2427. Though DHS found two of the three engagements were not roughly equal in size to $50 million over the past five years, the three engagements' "high degree of technical similarity . . . merit[ed] a rating of Some Confidence." Tab 74 at AR 2388.

The following table shows the Agency's conclusions concerning the size of Delviom's engagements:

**The TET's Evaluation of Delviom's Prior Corporate Experience**

| | Calculated Value per Year | Calculated Duration | Calculated Total Value | Roughly Equal to $50 million? |
|---|---|---|---|---|
| FEMA | $10.8 million | 3 years | $31.5 million | Yes |
| Treasury | $10.2 million | 1.1 years | $11.4 million | No |
| USCIS | $17.6 million | 1.3 years | $22.6 million | No |

*See id.* at AR 2383–87; Tab 77 at AR 2427.

The TET concluded that although Delviom received an additional strength compared to SOFITC3, this was offset by two of Delviom's experiences, which were not roughly equal to $50 million. Tab 77 at AR 2427. Meanwhile, all Plaintiff's experiences were similar in size to the

10

Solicitation contract. *Id.* Thus, SOFITC3 received a "High Confidence" score while Delviom received a "Some Confidence" rating. *Id.*

### 2. Best Value Trade-Off Analysis

DHS did not reevaluate Management & Staffing Approach or Technical Approach & Qualification as part of its corrective action. *See id.* at AR 2425. However, it still considered these factors as part of its new best value trade-off analysis. *Id.* at AR 2429.

First, the Agency reviewed its previous evaluation of Management & Staffing Approach. It explained Delviom had significant strengths, including

> the offeror's assertion of achieving a 94% five-year retention rate, achieving a 100% retention rate over the last 14 months through its staffing and retention strategy, and the inclusion of a well thought out and detailed immediate and long-term plan for staffing and retention that includes knowledge retention practices and [***] per employee.

*Id.*; *see also* Tab 36a at AR 1254–56. Defendant also assessed Defendant-Intervenor a strength for its workforce issue response, highlighting "[***]," as well as "[***][and] lessons learned, this shows that the offeror is trying to understand the problems, possibly predict future issues and is improving future workforce preemptively." Tab 36a at AR 1254. DHS concluded "this shows that the offeror is trying to understand the problems, possibly predict future issues and is improving future workforce preemptively." *Id.* The Agency also praised Delviom's recruitment policy. *Id.* at AR 1255.

Delviom received one weakness stemming from its "lack of detail concerning workforce composition and skills mix regarding actual roles and correlated skills to support tasks." Tab 77 at AR 2429; *see also* Tab 36a at AR 1255. The TET noted: "[t]his will be a risk to the government as it does not meet the requirement, or the offeror does not provide sufficient information on how they will accomplish the requirement." Tab 77 at AR 2429. But for purposes of the best value trade-off, Delviom's "strengths greatly outweigh this weakness, and considering the entire quote, the government has a high degree of confidence in the offeror's ability to manage the project and ensure adequate and continuous staffing." *Id.*

Like Defendant-Intervenor, Plaintiff fully responded to the Management & Staffing Approach section's instructions. *Id.*; Tab 36c at AR 1270. Defendant noted SOFITC3 had "a greater than ninety percent, five-year retention rate." Tab 36c at AR 1271. But the Agency determined "SOFITC3's management and staffing approach demonstrated neither strengths nor notable weaknesses, leaving the government with Some Confidence in the offeror's approach." Tab 77 at AR 2429; *see also* Tab 36c at AR 1271 (explaining after TET conducted a "thorough review of this section, there were no strengths or weaknesses identified"). Defendant concluded Delviom's approach to management and staffing was qualitatively superior to SOFITC3's proposed strategy. Tab 77 at AR 2429.

Defendant then turned to its evaluation of the Technical Qualifications & Approach factor. *Id.* Delviom received a "Some Confidence" rating. *Id.* While the proposal received both strengths

and weaknesses, "the strengths in this case do not fully or effectively offset the weaknesses." *Id.* In contrast, SOFITC3 received a "Low Confidence" score—the lowest possible ranking. *Id.* at AR 2430. Its proposal was fully responsive to the RFQ, but it contained several weaknesses and no strengths. *Id.* Plaintiff responded to a question about how it would increase the speed or efficacy of the authorization process poorly and in a way that "demonstrate[d] a poor understanding of [***]." *Id.*; *see also* Tab 36c at AR 1274–75 ("SOFITC3 suggested a lifecycle that would waste money and time because they didn't understand [***].").

To conclude its analysis of this factor, the Agency found "neither quote is particularly good, but Delviom's quote is qualitatively superior to SOFITC3's here." Tab 77 at AR 2430. Delviom's proposal showed "a deep understanding of the technical concepts involved in some aspects of the contemplated work but leaves the TET with the impression in other areas that Delviom is simply repeating the requirement without demonstrating a solid understanding or approach." *Id.* In contrast, "SOFITC3's proposed technical approach affirmatively demonstrates a poor understanding of the key technical requirements in certain areas, and these weaknesses are not offset by any noted strengths." *Id.* Emphasizing again that neither vendor provided a particularly good quote, the Agency concluded "Delviom's quote rightly instills greater confidence than SOFITC's [sic] quote for Factor 4." *Id.*

Ultimately, after concluding its analysis, DHS found that Delviom's quote represented the best value. *Id.* at AR 2431. Recognizing SOFITC3's proposal was qualitatively superior in Prior Corporate Experience—the most important of the technical evaluation factors—the Agency found Delviom's quote was technically and qualitatively superior in the three remaining technical factors: Management & Staffing Approach, Technical Qualifications & Approach, and Cybersecurity Readiness. *Id.* at AR 2432. The Agency decided it could not justify paying SOFITC3 more based solely on its higher Prior Corporate Experience score. *Id.* It explained: "[t]he tradeoff in this case, if we were to award to the higher priced offeror, would not be justified, because all but one technical factor supports the lower-priced offeror, so, paying a premium for better Prior Corporate Experience would also result in lower technical confidence in all other areas." *Id.* The Agency noted it considered "the high technical similarity of two of Delviom's experiences to the contemplated work, Delviom's impressive historical retention rate and detailed plans toward employee retention and training, SOFITC3's poor understanding of [***], and SOFITC3's $3.3M higher price." *Id.*

## II.    Procedural History

On March 26, 2025, DHS notified SOFITC3 that Delviom was again awarded the contract after the reevaluation. ECF No. 28 at 1. The Agency agreed to voluntarily stay performance of the award until June 26, 2025. ECF No. 29 at 1.

Plaintiff filed an Amended Complaint on April 25, 2025. Am. Compl., ECF No. 32. On May 2, 2025, Defendant and Defendant-Intervenor filed Motions for Judgment on the Administrative Record, and Plaintiff's Motion for Judgment on the Administrative Record followed four days later. Def.'s Mot.; Def.-Intervenor's Mot.; Pl.'s Mot. The parties filed Responses on May 9, 2025 and their Replies a week later. Def.'s Resp., ECF No. 41; Def.-Intervenor's Resp., ECF No.

42; Pl.'s Resp., ECF No. 43; Pl.'s Reply, ECF No. 47; Def.'s Reply, ECF No. 48; Def.-Intervenor's Reply, ECF No. 51. This case is ripe for review.

During merits briefing, Plaintiff filed a Motion for Preliminary Injunction even though the Government agreed to voluntarily stay performance in this case during the pendency of this litigation. Mot. for Prelim. Inj. Delviom and DHS filed Responses on April 30, 2025. Def.'s Resp. to Mot. for Prelim. Inj., ECF No. 34; Def.-Intervenor's Resp. to Mot. for Prelim. Inj., ECF No. 35. SOFITC3 filed its Reply on May 7, 2025. ECF No. 40.

Then, on May 13, 2025, Plaintiff moved to correct its prior filings because it failed to file a declaration with its Reply. *See* ECF No. 44 at 1; ECF No. 44-1 at 1. DHS and Delviom opposed. *See generally* ECF No. 44; ECF No. 50; ECF No. 51; ECF No. 53.

Since this Court denies Plaintiff's Motion for Judgment on the Administrative Record and grants Defendant's and Defendant-Intervenor's Motions in this Opinion, both Plaintiff's Motion for a Preliminary Injunction and its Motion to Amend or Correct its Response are now moot.

## III.    Jurisdiction and Legal Standards

The Court has jurisdiction under 28 U.S.C. § 1491(b)(1). And the Court "give[s] due regard to the interests of national defense and national security" in this matter. *Id.* § 1491(b)(3). Under the Administrative Procedure Act standard, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted); *see also Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020) (citation omitted).

When a challenge is brought under the former provision, if the reviewing court "finds a reasonable basis for the agency's action, [it] should stay its hand." *Wks. Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (citation omitted). A court "must sustain an agency action unless the action does not evince[] rational reasoning and consideration of relevant factors." *PAI Corp. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2010) (quotation marks and citations omitted). "De minimis errors in the procurement process do not justify relief." *Off. Design Grp.*, 951 F.3d at 1373 (citation omitted). In sum, the court must decide whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333 (citation omitted); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citation omitted).

The "disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa*, 283 F.3d at 1333 (quotation marks and citations omitted). A plaintiff's mere disagreement with the contracting agency's judgment is insufficient to sustain a protest. *HealthRev, LLC v. United States*, 172 Fed. Cl. 73, 87 (2024) (citing *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)). "Evaluation of experience and past performance, by its very nature, is subjective[,] and an offeror's mere disagreement with an agency's evaluation judgments does not demonstrate that those judgments are

13

unreasonable." *Gritter Francona, Inc. v. United States*, 158 Fed. Cl. 597, 608 (2022) (cleaned up) (quoting *Sci. & Mgmt. Res., Inc. v. United States*, 117 Fed. Cl. 54, 65–66 (2014)).

## IV.    Discussion

SOFITC3 primarily challenges two aspects of the Agency's evaluation.  First, Plaintiff makes a variety of arguments attacking Phase 2 of the Solicitation.  It argues the Agency improperly considered Delviom's two FEMA contracts as one engagement.  As a result, SOFITC3 claims DHS erred in evaluating Delviom's Prior Corporate Experience submission because it was materially nonconforming and contained misrepresentations which prohibited Defendant-Intervenor from receiving the award.

Second, Plaintiff alleges the Agency disparately evaluated Management & Staffing Approach (Factor 3) and Technical Qualifications & Approach (Factor 4) submissions in Phase 3. SOFITC3 claims DHS' evaluation evinced unequal treatment because it impermissibly assigned strengths to Delviom's Phase 3 proposal while ignoring substantively similar strengths in Plaintiff's quote.  SOFITC3 avers these errors render the Agency's action arbitrary and capricious.

Finally, Plaintiff claims Delviom was able to propose a lower price because it deviated from the RFQ's terms and improperly proposed lower staffing levels.  The Agency purportedly recognized this deficiency when it awarded Defendant-Intervenor a weakness in its Management & Staffing Approach.  SOFITC3 argues this error gave Delviom an illusory price advantage.  Coupled with the other errors in the procurement, SOFITC3 claims Defendant's best value analysis was therefore fatally flawed.

### A.    Prior Corporate Experience Arguments

#### 1.    The Agency Rationally Counted Delviom's FEMA Contracts as a Single Engagement.

After corrective action, DHS found Delviom only had one engagement roughly equal to $50 million over the past five years: the FEMA contracts.  Tab 25 at AR 923.  Delviom explained its FEMA experience stemmed from two contract awards with consecutive performance.  *Id.* (listing two award reference numbers).  However, SOFITC3 asserts Delviom was only the prime contractor for the first award, which ran from June 14, 2021 through September 29, 2023.  *See* Pl.'s Mot. at 8 (citing ECF No. 32-1 at 149–50).  Plaintiff claims a "separate legal entity," [***], held the second award, which had an estimated period of performance from September 30, 2023 through June 29, 2027.  *Id.*

SOFITC3 argues Defendant-Intervenor could not provide two separate and distinct contracts for one engagement under the Solicitation's terms.  Pl.'s Mot. at 8.  The RFQ instructed quoters to "[d]escribe [their] prior corporate experience for up to three separate *engagements*."  Tab 15a at AR 726 (emphasis added) ("For the purposes of this specific response, demonstrate prior corporate experience for each *engagement* roughly equaling $50 million over the past five years."), 734 ("[T]he Government will evaluate the extent to which up to three separate *engagements* demonstrate corporate experience roughly equaling $50 million over the past five years.").  *See also* Tab 13b

(referring to three engagements when discussing the requirements for Prior Corporate Experience submissions).

In the context of the RFQ, Plaintiff maintains the term "engagement" limited potential offerors to submitting three contracts or task orders which would be evaluated individually, not cumulatively. Pl.'s Mot. at 10. So, in its view, Delviom facially violated the plain language of the Solicitation by providing two contracts for one engagement. Pl.'s Reply at 1 (contending the RFQ's language "could not be clearer").

Defendant-Intervenor and Defendant both interpret "engagement" differently from SOFITC3. Delviom maintains its FEMA awards constitute a singular engagement, arguing "no proposal instructions prohibited offerors from identifying a single 'engagement'—in this case, a single program—performed across two contracts." *Compare* Def.-Intervenor's Mot. at 13 (citing to Tab 15a at AR 726) *with* Pl.'s Resp. at 5 (claiming Delviom and DHS provide no support for their understanding of engagement). It points out that the Solicitation uses the word "engagement" instead of "contract," and its quote transparently disclosed it treated two related contracts as a single engagement. Def.-Intervenor's Mot. at 13–14; Def.-Intervenor's Resp. at 4. To Delviom, the record shows DHS exercised its discretion and decided an "engagement" was not merely a single contract. *See* Def.-Intervenor's Resp. at 4.

DHS agrees the plain language of the RFQ meant an offeror's experience could encompass multiple related contracts. *See* Def.'s Reply at 4. It asserts "the solicitation specified Factor 2 submissions—not in terms of discrete contracts—but in terms of 'engagements.'" Def.'s Resp. to Mot. for Prelim. Inj. at 8. And even if the RFQ actually limited vendors to submitting three contracts instead of experiences, "[t]he solicitation does not require the rejection of quotes based on the failure to strictly comply with the submission criteria." Def.'s Resp. at 3; *see also* Def.-Intervenor's Mot. at 12 (explaining there is no evidence in the RFQ that the Agency "would—or even could—have rejected a quote that lacked perfectly analogous Prior Corporate Experience").

When a term in a bid protest is contested, a reviewing court must first look to the plain language of the solicitation. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (citation omitted). "The solicitation is ambiguous only if the language is susceptible to more than one reasonable interpretation." *Id.* (citation omitted). And the reviewing court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (citation omitted). Moreover, when a procuring agency circulates its answers to a Question & Answer session as an attachment to an amendment of the solicitation, those answers must be interpreted as part of the solicitation. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016) (citation omitted).

"To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (quoting *Metric Constr., Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). Instead, both terms must be within a "zone of reasonableness." *Id.* An ambiguity or defect in a solicitation "is patent if it is an obvious omission, inconsistency, or discrepancy of significance. Additionally, a defect is patent if it could have been discovered by reasonable and customary care." *Oak Grove*

*Techs., LLC v. United States*, 116 F.4th 1364, 1378 (Fed. Cir. 2024) (quoting *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020)).

"An ambiguity will only be construed against the government if it was not obvious on the face of the solicitation." *NVT Techs.*, 370 F.3d at 1162 (citing *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)). And "where a government solicitation contains a patent ambiguity, the government contractor has a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government." *Per Aarsleff*, 829 F.3d at 1311 (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)).

In this case, each party proffers a definition of "engagement" which falls within the zone of reasonableness. Plaintiff's claim that "engagement" referred to a single contract or task award is plausible. But Defendant's and Defendant-Intervenor's assertions that "engagement" is not limited to a discrete task order or a single contract is equally plausible under the RFQ. The Solicitation consistently uses "engagement" instead of more specific terms to describe prior corporate experience. *See* Tab 15a at AR 726–27, 734–35.

And the plain meaning of "engagement" does not favor either side. The most relevant definition of engagement indicates the term refers to "a job or period of employment." Merriam-Webster's Collegiate Dictionary, 413 (11th ed. 2020). A "period of employment" could refer either to a single contract or to the performance of multiple related task orders. Thus, because "engagement" is "susceptible to more than one reasonable interpretation," it is ambiguous. *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000) (citing *Hill Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992)).

The ambiguity of "engagement" in the Solicitation was patent. It was obvious the Solicitation omitted the words "contract" or "task order" in the Prior Corporate Experience instructions. *See* Tab 15a at AR 726–27, 734–35. Instead, the RFQ expressly used "engagement" over these specific and precise alternatives. *Id.* Because the ambiguity was patently obvious, SOFITC3 waived its opportunity to challenge the Agency's interpretation of "engagement." *See Per Aarsleff*, 829 F.3d at 1311 (citation omitted).

The Agency's Q&A responses indicate the omission of the term "contract" from the Prior Corporate Experience instructions may have been intentional. First, in response to a question about what was "considered 'relevant' for engagements in cybersecurity governance and compliance," DHS instructed "[p]rior corporate experience should demonstrate the capacity of the offeror to manage *projects* similar in size, scope, and complexity to the contemplated requirement." Tab 13b at AR 552 (emphasis added). Instead of using "contract," "task order," or "engagement," Defendant defined the experiences it sought as "projects." *See id.* Therefore, it is reasonable to conclude, "engagement" could encompass multiple related contracts or constitute a single project.

Similarly, the Agency was asked how its "evaluation [would] differentiate between experience led by the prime versus the subcontractor." *Id.* The quoter substituted "experience" for "engagement," and so did DHS in its response. Defendant wrote: "[p]rior corporate experience will be considered holistically. Offerors are advised to submit prior corporate *experience* that best

demonstrates the combined team's ability to manage an effort of similar size, scope, and complexity." *Id.* (emphasis added). In addition to substituting "engagement" with "experience"—a term that could encompass multiple related contracts—the Agency instructs that "experience" or "engagements" will be considered holistically. *Id.*

Thus, the RFQ contained a patent ambiguity. Not only did the Prior Corporate Experience instructions conspicuously omit the words "contract" or "task order," the Agency consistently used indefinite words like "project" and "experience" and promised to consider Prior Corporate Experience "holistically." *See id.*; *Per Aarsleff*, 829 F.3d at 1312 (finding a disappointed bidder was on notice of the ambiguity in a solicitation because of the government's responses in Q&As).

Accordingly, because of the term's ambiguity, SOFITC3 had "a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government." *Per Aarsleff*, 829 F.3d at 1311 (citing *Blue & Gold Fleet*, 492 F.3d at 1313); *see also NVT Techs.*, 370 F.3d at 1162 (citing *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997)) ("If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail."). Plaintiff waived its opportunity to dispute the Solicitation's definition of "engagement" and its applications to Delviom's FEMA contracts. *See Per Aarsleff*, 829 F.3d at 1312 (citing *Blue & Gold Fleet*, 492 F.3d at 1313).

SOFITC3 raised two additional arguments related to its claim that Delviom's FEMA experience constituted two engagements. First, under its definition of "engagement," Delviom impermissibly included four engagements in its quote. *See, e.g.*, Pl.'s Resp. at 3, 5–6; Am. Compl. at 13. Second, since the FEMA engagement was two separate contracts, the Agency could not combine their value to find the engagement was worth roughly $50 million. *See* Pl.'s Resp. at 6; Am. Compl. at 13–14. Since the Court defers to DHS' interpretation of the engagement requirement, these arguments must fail. Using Defendant's interpretation of engagement, Delviom only submitted three engagements—the maximum number under the Solicitation—and it could permissibly combine the value of the two task orders.

## 2. The Agency Rationally Evaluated Delviom's Prior Corporate Experience.

SOFITC3 next argues Delviom's quote was nonconforming because the value of each of its three engagements was not roughly equal to $50 million in the past five years. Pl.'s Resp. at 3–4. In Plaintiff's view, DHS' evaluation of Delviom's quote "stretch[ed] the flexibility of 'roughly.'" *Id.* at 4. First, SOFITC3 disputes the Agency's finding that the FEMA engagement was worth $31.5 million over about three years of performance. *Id.* at 7; Pl.'s Mot. at 12. By Plaintiff's count, the FEMA engagement was really only worth $24.1 million over three years. Pl.'s Resp. at 7. And since the Agency found Delviom's USCIS experience did not roughly equal $50 million, the FEMA experience similarly cannot count as equivalent. *Id.* at 6–7 (basing its calculations on exhibits provided by Delviom and public records not within the Administrative Record). SOFITC3 contends "it is clear that Delviom failed to meet the requirement to propose at least one example of its own corporate experience valued at roughly $50 million. Such a non-conforming quote cannot be the basis for award." *Id.*

Second, Plaintiff asserts the Solicitation was "[c]lear as day" that the provision requiring engagements to equal roughly $50 million was a material requirement of the RFQ. *Id.* at 3–4. Therefore, Plaintiff argues the procurement officials' finding that Delviom's FEMA engagement was roughly equal to $50 million is not entitled to discretion because their conclusion was inconsistent with a material term of the Solicitation. *Id.* at 4 (citation omitted).

Finally, Plaintiff avers Defendant-Intervenor was not responsible for all work on the FEMA engagement because "[a]s a member of a joint venture, Delviom is not even responsible for the full value of [***]' FEMA corporate experience." Am. Compl. at 14 (citation omitted); *see also* Pl.'s Resp. at 6. According to SOFITC3, Defendant-Intervenor "could have *either* claimed corporate experience of $18.8 million for itself *or* corporate experience of $10.5 million for [***] during the relevant five-year period." Pl.'s Resp. at 6. SOFITC3 claims "the Agency used creative math to credit Delviom with the future value of *[***]'s* work." Pl.'s Mot. at 12.

SOFITC3 distinguishes its own Prior Corporate Experience submission, which also included work belonging to a joint venture. It argues "[a] key difference between SOFITC3's Factor 2 quote and Delviom's . . . is the detail SOFITC3 provided about which company performed what work." *Compare* Pl.'s Resp. at 7 (citing Tab 27 at AR 950–54) *with* Tab 25 at AR 923 (noting the FEMA engagement included work Delviom completed as a prime contractor and a "recompete won under [its] JV with Delviom as managing member").

Defendant disputes SOFITC3's arguments. *See, e.g.*, Def.'s Mot. at 11–13; Def.'s Reply at 3. DHS avers each engagement's size was a component of its qualitative assessment for Prior Corporate Experience. Def.'s Reply at 3 (citing Def.'s Mot. at 11). It challenges SOFITC3's valuation of the FEMA engagement, alleging Plaintiff cherry-picked information which reflected decisions made by FEMA *after* the quote deadline. *Id.* at 5 (first citing Def.'s Resp. at 5; and then citing Def.'s Mot. at 12–13); Def.'s Mot. at 13 (alleging SOFITC3's calculations were based in part on events that transpired *after* Delviom submitted its proposal, which could not be considered by the Agency). And it argues the inclusion of the roughly $50 million provision was not a material term in the Solicitation. Def.'s Reply at 2–3 (pointing out the RFQ only used the terms "noncompliant" and "ineligible" when referring to Phase 1 of the procurement).

Defendant-Intervenor expressed similar disagreement with SOFITC3's arguments. Delviom objects to SOFITC3's use of "incorrect" publicly available sources and claims Plaintiff's arguments are mere disagreements with the Agency's evaluation. Def.-Intervenor's Mot. at 14; Def.-Intervenor's Resp. at 6 ("SOFITC3's alternative arithmetic underscores the flaw in its argument."). Delviom also notes "the RFQ did not apply different rules to joint ventures, such that a member of a joint venture prime contractor must dilute any experience it performed as a member of a joint venture." Def.-Intervenor's Mot. at 14 (citing to Tab 15a at AR 726); *see also* Def.-Intervenor's Resp. at 7 (noting SOFITC3 is a joint venture and its proposal included engagements performed by other joint ventures, ASIRTek Federal Services and AlliantCorps, LLC).

The Court must defer to an agency's technical evaluation when, as here, it provides "a coherent and reasonable explanation of its exercise of discretion." *AccelGov, LLC v. United States*, 174 Fed. Cl. 212, 223–24 (2024) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992

(Fed. Cir. 2024)). The deference afforded to an agency is even greater when the reviewing court assesses a technical evaluation. *HealthRev*, 172 Fed. Cl. at 85 (citing *Axiom Res. Mgmt.*, 564 F.3d at 1381). And the reviewing court's decision must be based on the record the agency presents. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review." *Axiom Res. Mgmt.*, 564 F.3d at 1380 (citation and quotation marks omitted). Supplementation of the record should be limited to cases where "the omission of extra-record evidence precludes effective judicial review." *Id.* (citation omitted).

Here, DHS based its evaluation of Delviom's proposal on the record before it. *See* Tab 77 at AR 2427. The Agency expressly explained that the TET calculated the value of each of Delviom's engagements using the number of years the entity had performed during the relevant five-year period. *Id. See also* Tab 74 at AR 2379. As discussed above, the Agency reasonably concluded the two FEMA task orders were part of the same engagement and Delviom could receive credit for the combined value of both awards. Based on the TET's calculations, the FEMA engagement was "somewhat similar in size ($31.5M over 3 years) to the contemplated requirement (roughly $50M over 5 years) and therefore roughly equal to $50 million over the last five years." Tab 74 at AR 2384. Its calculations were based on information Delviom provided in its proposal. *Id.* at AR 2383. It computed the award was worth $10,758,840.32 per year and that it could only consider 1,069 days or 2.93 years of the award "based on the stated period of performance and contract values." *Id.*

In contrast, Plaintiff does not clearly explain how it came to its calculations. Other than stating it relied on materials outside of the Administrative Record, it is not clear exactly how Plaintiff determined the value of Delviom's FEMA work. *See, e.g.*, Pl.'s Resp. at 6 (asserting its calculations without explaining its underlying work). SOFITC3's calculations changed during briefing, and it based its allegations on new information it received throughout the course of litigation. *Id.* at 6 n.6. And while Plaintiff explained it obtained at least some of this information from public records, it did not allege either the Agency relied on this information or the Administrative Record was incomplete. *See, e.g.*, Pl.'s Mot. at 1, 8. n.2. The Court cannot rely on information that was not before the Agency or rely on extra-record evidence. *Axiom Res. Mgmt.*, 564 F.3d at 1380 (citations omitted) (explaining it would be error for a court to rely on documents outside of the record).

SOFITC3 does not meet its "heavy burden" to demonstrate that the Agency had no reasonable basis for its FEMA engagement evaluation. *See Impresa*, 238 F.3d at 1333. The Court will not second guess the discretionary determinations of procurement officials, especially when they "deal with the minutiae of the procurement process in such matters as technical ratings." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Since the Agency provided a reasonable and coherent explanation for finding the FEMA engagement to be roughly similar in size to the contract at issue, the Court must defer to the Agency's technical evaluation. *See AccelGov*, 174 Fed. Cl. at 223–24 (citing *Dell Fed. Sys.*, 906 F.3d at 992). The Agency permissibly decided the FEMA engagement to be roughly equal in value to $50 million. Given DHS did not err in

19

determining Delviom met the requirement, the Court does not reach whether this requirement was a material term of the Solicitation.

### 3.    Misrepresentations

SOFITC3 further argues "Delviom knew the actual value of its performance over the prior 5-year period was nowhere near close to $58 million, and yet it claimed it was.  This blatant misrepresentation alone is reason to exclude Delviom from the competition."  Pl.'s Resp. at 6 (citation omitted); *see also* Pl.'s Mot. at 12 (arguing Delviom's quote was misleading).  This claim also fails.

The Administrative Record refutes Plaintiff's argument.  First, Defendant-Intervenor did not claim the FEMA engagement was worth $58 million in the prior five years.  *See* Tab 25 at AR 923.  It lists the FEMA experience as lasting from September 2021 through March 2027 and includes two separate contract numbers.  *Id.*  As Defendant explains, "the engagement's extension beyond the quote submission deadline was not a 'misrepresentation' because Delviom disclosed the period of performance and the Government apportioned the creditable value based on Delviom's disclosure."  Def.'s Reply at 5 (citing Tab 74 at AR 2383–84).  The record shows the contracting officials understood this because they calculated the value of the FEMA engagement for the relevant time period.  Tab 77 at AR 2427; Tab 74 at AR 2383–84.  Further, Defendant-Intervenor's practice here mirrors Plaintiff's approach to its Prior Corporate Experience submission where it listed both future experience and experience too old for DHS to consider.  Tab 27 at AR 950 (denoting two engagements with performance periods lasting until 2026).

### B.    DHS Did Not Disparately Evaluate SOFITC3's and Delviom's Quotes.

Plaintiff alleges Defendant disparately and unequally evaluated SOFITC3's and Delviom's Management & Staffing Approach and Technical Qualifications & Approach volumes.  Pl.'s Mot. at 14–23; Pl.'s Resp. at 14 (describing the Agency's evaluations for these factors as "textbook examples of disparate treatment").  DHS did not reevaluate these factors as part of its corrective action.  Tab 77 at AR 2425.

Plaintiff concludes it received a "Some Confidence" rating for its Management & Staffing Approach proposal and a "Low Confidence" rating for its Technical Qualifications & Approach submission because the Agency irrationally and unequally evaluated its proposal.  Pl.'s Mot. at 1; *see also* Am. Compl. at 3.  SOFITC3 states its approach to these factors was indistinguishable from strengths credited only to Delviom.  Pl.'s Mot. at 14, 21; *see also* Am. Compl at 16–17 (claiming its Factor 3 approach contained "identical language and functionality" to Delviom's submission).  Plaintiff also contests the "Low Confidence" score it received for its Technical Qualifications & Approach submission, arguing its quote was "equal, if not superior, to Delviom's" proposal.  Pl.'s Mot. at 1; *see also* Pl.'s Reply at 1.  Taken together, SOFITC3's claims challenge the Agency's conclusion that the TET appropriately and evenly applied the definition of "strength" in its Phase 3 evaluation.  *See* Tab 77 at AR 2425 (asserting the TET correctly applied "strengths" in its Phase 3 analysis, negating the need for DHS to redo these evaluations as part of its corrective action).

The FAR requires procurement officials to treat offers fairly, impartially, and equitably. FAR 1.602–2(b). However, "[a]n agency is under no obligation to assign dissimilar proposals the same evaluation rating." *Off. Design Grp.*, 951 F.3d at 1372. "All contractors and prospective contractors shall be treated fairly and impartially *but need not be treated the same*." FAR 1.102–2(c)(3) (emphasis added). Notably, in a FAR subpart 8.4 procurement, "the Agency is neither expected nor required to document every decision it makes in rigorous detail." *Integrated Fin. & Acct. Sols, LLC v. United States*, 161 Fed. Cl. 475, 496 (2022) (citing *22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at \*10 (Fed. Cl. July 21, 2021)).

To prevail on a disparate treatment claim, "a protester must show that the agency unreasonably downgraded its proposal for deficiencies that were substantively indistinguishable or nearly identical from those contained in other proposals." *Off. Design Grp.*, 951 F.3d at 1372 (quotation marks and citation omitted). "The same standard applies when a protestor alleges an agency unequally assessed strengths in [an] offeror's proposal." *SSI Claimsnet, LLC v. United States*, 170 Fed. Cl. 725, 745 (2024) (citing *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 290–91 (2022)). If the reviewing court is not convinced that the proposals are substantively indistinguishable or nearly identical, it should dismiss the claim. *Off. Design Grp.*, 951 F.3d at 1373. "To allow otherwise would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings." *Id.*

### 1.    Management & Staffing Approach

For the Management & Staffing Approach factor, SOFITC3 identifies three instances where it believes the Agency treated the two proposals unequally: (1) workforce issue response; (2) [\*\*\*]; and (3) staffing and retention strategy. Pl.'s Mot. at 15–19. The TET awarded Delviom strengths in all three areas, meaning there were "aspect[s] of the quote that exceed[ed] the government's stated requirements, adding value to the quote." Tab 77 at AR 2425. But the TET did not find similar strengths in SOFITC3's proposal. *Id.* at AR 2429.

First, SOFITC3 alleges it and Delviom "proposed substantively indistinguishable plans and processes for monitoring performance issues and studying turnover [\*\*\*]" regarding workforce response. Pl.'s Mot. at 16. And in its evaluation of Delviom, the Agency explained Delviom's workforce issue response showed "the offeror is trying to understand the problems, possibly predict future issues and is improving future workforce preemptively." Tab 36a at AR 1254 (citing Tab 32a at AR 1009). Consequently, the TET awarded Defendant-Intervenor a strength. *Id.* The TET highlighted details like "[\*\*\*]." *Id.* In contrast, Plaintiff's Management & Staffing Approach submission received no strengths or weaknesses. Tab 77 at AR 2429; Tab 36c at AR 1271.

Second, Plaintiff challenges the Agency's decision to award Delviom—but not SOFITC3—a strength for its [\*\*\*] of high turnover. Pl.'s Resp. at 9. SOFITC3 contends again its and Delviom's plans were substantively indistinguishable, pointing to both proposals' discussion of knowledge retention. *Id.* Plaintiff complains Defendant's evaluation was insufficiently detailed and it failed to credit SOFITC3's "detailed immediate and long-term plan to address high turnover by offering a two-step approach" to address the workforce retention issue. *Id.*

Third, Plaintiff contests Defendant's comparative praise for Defendant-Intervenor's staffing and retention rate, despite SOFITC3's retention rate allegedly being very similar. Pl.'s Mot. at 18–19. DHS noted Delviom achieved a ninety-four percent employee retention rate over five years and a hundred percent retention rate in the last fourteen months, whereas SOFITC3 had a greater than ninety percent retention rate. *Compare* Tab 36a at AR 1254 (citing 32a at AR 1010) *with* Tab 36c at AR 1271 (citing Tab 34a at AR 1145). *See also* Pl.'s Mot. at 19 (citing Tab 23a at AR 1010) (explaining Plaintiff had one contract with a ninety-five percent retention rate and another with ninety-two percent retention). SOFITC3 concludes the Agency offers no rational explanation for not giving SOFITC3 equal strengths for retention. Pl.'s Mot. at 18–19.

In response, the Agency asserts SOFITC3's arguments are internally inconsistent and show the proposals were substantively distinguishable. Def.'s Resp. at 7–10. Delviom accuses Plaintiff of "cherry-pick[ing] efforts to paint Delviom's and SOFITC3's proposals as 'substantively indistinguishable' . . ., [but] a comprehensive review shows they are not." Def.-Intervenor's Resp. at 9. The existence of some similarities between Delviom's proposal and SOFITC3's does not require the Court to "unnecessarily pars[e] the minutiae in an agency's evaluation." Def.-Intervenor's Resp. at 10 (citation and quotation marks omitted).

Indeed, the Court "is not convinced that the aspects of the proposals brought to its attention are indistinguishable for purposes of the evaluation." *Enhanced Veterans Sols, Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017). While the proposals share some similarities, including the language used to describe workforce issue responses and [***], the Agency consistently provided enough explanation about how it distinguished the two proposals as a whole.

SOFITC3 emphasizes similarities between the two proposals. Pl.'s Mot. at 16–19. It claims its plan for monitoring performance issues and identifying the [***] of employee turnover was substantively similar to Delviom's, and the two plans used similar language to describe how the offerors would promptly respond to these issues. Pl.'s Mot. at 16 (citing Tab 34a at AR 1144). In a section titled "Responding to Contractual Performance issues promptly," Plaintiff reported it "uses quality control techniques" like peer reviews and audits "to minimize quality-related cost increases," "develops a Quality Assurance Plan" to create "accountability for performance results," and explains its risk management plan. Tab 34a at AR 1144.

However, these plans are substantively distinguishable from Delviom's quote. DHS cited to Delviom's section with a similar title—"Timely Response to Contractual Performance Issues." Tab 32a at AR 1009. But the underlying substance in Delviom's proposal varies significantly from SOFITC3's plan to deal with performance issues. *See id.* Delviom advertises its "proactive, transparent, and responsive approach" to identifying performance issues. *Id.* It claims to "[***] and [***] to resolve issues, always [***] to inform future task areas." *Id.*

The TET permissibly found that these two proposals contained substantive differences based on the language in each volume in the record. And its evaluation highlighted distinguishing factors in Delviom's proposal which led it to award a strength. *See* Tab 36a at AR 1254–55. The Court will not second guess the minutiae of the technical evaluations made by the procurement officials. *Enhanced Veterans Sols.*, 131 Fed. Cl. at 584 (citing *E.W. Bliss Co.*, 77 F.3d at 449).

22

Plaintiff's arguments concerning DHS' evaluation of its and Defendant-Intervenor's [***] are ultimately unconvincing. SOFITC3 focuses on its knowledge retention section, which is substantively similar to Delviom's knowledge base proposal. *See* Pl.'s Mot. at 17. And SOFITC3 emphasizes its seven-step action plan identified the [***] of turnover and included some elements that were similar to Delviom's plan. *Id.* at 17–18 (citing Tab 34a at AR 1158–59). Like Delviom, Plaintiff's proposal included references to long-term retention strategies like work-life balance and career development. *Compare* Tab 34a at AR 1158–59 *with* Tab 32a at AR 1024. The TET recognized some similar elements in both of their proposals. *See, e.g.*, Tab 36a at AR 1255 (mentioning Delviom's knowledge retention plan); Tab 36c at AR 1271 (discussing how SOFITC3's knowledge retention plan meets the Solicitation's requirements).

However, these similarities do not mean the Agency arbitrarily found a strength in Delviom's proposal and not in SOFITC3's submission. The TET explains it awarded Delviom a strength because Defendant-Intervenor's [***] was "[w]ell[] thought out and detailed immediate and long term plan[s,] including knowledge retention practices, [and] [***]." Tab 36a at AR 1255 (citing Tab 32a at AR 1023–24). Delviom's proposal contains more detail about its [***] than Plaintiff's submission. *See* Tab 32a at AR 1024. To mitigate employee turnover, Delviom invested heavily in [***]. *Id.* It "[***]." *Id.* The TET considered this evidence of Delviom's "[w]ell[] thought out and detailed immediate and long term plan[s]" to address the [***] of employee turnover. Tab 36a at AR 1255. *See also* Tab 77 at AR 2429 (characterizing Delviom's strength as "detailed plans towards employee retention"). SOFITC3's proposal lacked these details. Tab 34a at AR 1159. Here, "the record does not show that very similar features were evaluated differently." *Enhanced Veterans Sols.*, 131 Fed. Cl. at 589.

Finally, the Agency appropriately credited Delviom a strength for its retention plan. The TET accurately cites to the different retention rates in each proposal. *See* Tab 36a at AR 1254 (citing Tab 32a at AR 1009; Tab 36c at AR 1271 (citing Tab 34a at AR 1145). Delviom had a ninety-four percent retention rate across its federal contracts and a one-hundred percent retention rate in the last fourteen months. Tab 32a at AR 1010. In comparison, SOFITC3 claimed its USSOCOM and Air Force task orders had a greater than ninety percent retention rate. Tab 34a at AR 1145. The Agency acknowledges both proposals met the RFQ's requirements, but it specifically highlights Delviom's one-hundred percent retention rate in the last fourteen months as a strength that adds value for the Agency and goes beyond the Solicitation's requirements. *See* Tab 77 at AR 2429; Tab 36a at AR 1255. DHS was "under no obligation to assign dissimilar proposals the same evaluation rating." *Off. Design Grp.*, 951 F.3d at 1372.

Plaintiff has not met its burden to establish disparate evaluation of the Management & Staffing Approach factor. *See id.* at 1373. DHS consistently provides enough detail to distinguish Delviom's strengths from SOFITC3's proposal.

## 2.    Technical Qualifications & Approach

For the Technical Qualifications & Approach evaluation, SOFITC3 identifies two factors it claims were disparately evaluated. Pl.'s Mot. at 21–22. First, Plaintiff alleges it "proposed identical risk-informed prioritization and interconnected processes that would have increased

visibility." *Id.* at 21.  It argues "the Agency clearly performed a more dynamic evaluation of Delviom's quote under Factor 4" because the TET cited to more limited sections of SOFITC3's proposal than Delviom's, suggesting a more truncated review.  Pl.'s Mot. at 22.

However, a review of the record demonstrates the proposals were not identical. "[I]nconsistencies require the existence of nearly identical provisions in the proposals under consideration." *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588.  Delviom's materials emphasized its successful [***] program driven by [***].  Tab 32a at AR 1032.  It proposed using quantifiable metrics to allow stakeholders to engage in risk-informed decision-making using tools like [***].  *Id.* The TET recognized these features in its analysis of Defendant-Intervenor's proposal.  Tab 36a at AR 1258.  While SOFITC3 also utilized a risk-based ISCM approach and emphasized its ability to engage in real-time risk assessment, Plaintiff's Technical Qualifications & Approach submission does not mention using Open Security Control Assessment Language.  *See* Tab 34a at AR 1160–71.

Second, Plaintiff argues DHS disparately awarded Delviom a strength for its descriptions of its ongoing authorization strategy.  Pl.'s Mot. at 22.  The TET awarded Delviom a strength because its proposal "provide[d] a way for OCIO to possibly provide a more agile and responsive approach to the customer bse [sic]  [***] . . . also increase responsiveness of the government to ensure a better cybersecurity posture."  Tab 36a at AR 1258 (citing Tab 32a at AR 1033–34).  SOFITC3 claims its proposal has substantively similar language.  Pl.'s Mot. at 22–23.  And Plaintiff asserts the Agency provides no explanation for why it awarded Delviom a strength and not SOFITC3.  *Id.* at 23.  But Plaintiff's argument disregards the TET's note that Delviom's proposal could provide it a more "agile and responsive approach" to its customer base.  Tab 36a at AR 1258; *see also* Pl.'s Mot. at 22.  The Agency has discretion to make these determinations, and SOFITC3 has not met its burden to establish that here the procurement officials acted irrationally.  *See Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 288 (2024).

In sum, the Court "is not convinced that the aspects of the proposals brought to its attention are indistinguishable for purposes of the evaluation."  *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588.  Nor will it second guess the minutiae of the technical evaluations made by the procurement officials.  *Id.* (citing *E.W. Bliss Co.*, 77 F.3d at 449).

## C.    The Solicitation Did Not Require the Agency to Reject Delviom's Proposal Because of its Phase 3 Weakness.

Plaintiff argues the Agency's decision to award Delviom a weakness for its staffing approach meant "Delviom was noncompliant with a material evaluation requirement."  Pl.'s Mot. at 20 (citing Tab 15a at AR 790).  Delviom received a weakness because its proposal lacked detail about its planned workforce composition.  Tab 77 at AR 2429.  The TET found this weakness would either "be a risk to the government as it does not meet the requirement, or the offeror does not provide sufficient information on how they will accomplish the requirement."  Tab 36 at AR 1260.  But as Plaintiff's "Low Confidence" rating suggests, DHS determined SOFITC3's proposal contained significant shortcomings.  *E.g.*, Tab 36c at AR 1274–75 ("SOFITC3 suggested a lifecycle that would waste money and time because they didn't understand [***].").

Plaintiff alleges "[t]he Agency's decision to not only include Delviom in the competitive range but also rate its Factor 3 quote 'High Confidence' is simply not supported by the Agency's own evaluation, which identified this material nonconformance." Pl.'s Mot. at 20 (citing Tab 36a at AR 1255). "It should have been impossible, then, for Delviom to receive the contract award when the Agency found that it failed to comply with a fundamental requirement of the RFQ. No explanation is provided as to why Delviom's nonconformance was overlooked." Pl.'s Resp. at 11.

As an initial matter, the TET did not definitively find Delviom's proposal failed to meet the requirement. *See* Def.'s Resp. at 9. The procurement officials noted that the quote did not include enough information for a conclusive determination. Tab 36 at AR 1255 (explaining either Defendant-Intervenor's proposal failed to meet a requirement, *or* it did not sufficiently explain in enough detail how it would accomplish the requirement).

Further, the RFQ did not require DHS to reject a quote for failing to provide this information. *See generally* Tab 15a. The Solicitation stated Defendant "reserve[d] the right to reject and not to evaluate any quote that fail[ed] to comply with the instructions." *Id.* at AR 722. DHS decided Delviom's "strengths greatly outweigh [its] weakness, and considering the entire quote, the government has a high degree of confidence in the offeror's ability to manage the project and ensure adequate and continuous staffing." Tab 77 at AR 2429.

### D.    Best Value Determination

SOFITC3's final argument focuses on the Agency's best value trade-off analysis. In its assessment, DHS explained it could not justify paying a $3.3 million premium for Plaintiff's services, especially since its proposal only received a higher score than Delviom's under the Prior Corporate Experience factor. *Id.* at AR 2432. Plaintiff alleges this analysis irrationally ignored that Delviom's price advantage was illusory because it reflected the staffing approach DHS flagged as a weakness. Pl.'s Mot. at 24–25. If the Agency had excluded the savings from this "unacceptable" staffing approach, Delviom's proposal would allegedly be $1.9 million more expensive than SOFITC3's quote. *Id.* at 25.

The Agency again successfully refutes SOFITC3's claim. Def.'s Resp. at 11. Defendant asserts Delviom's weakness for its proposed staffing mix did not render its proposal unacceptable, and "[t]here is nothing in the record to support SOFITC3's charge that Delviom's price advantage was somehow 'illusory.'" *Id.* at 11–12. DHS notes Delviom's quoted price for the base year of the contract was higher than SOFITC3's, reflecting Delviom's intent to invest heavily in automation early on in the contract to reap cost savings. *Id.* at 12. And Defendant points out SOFITC3 did not explain the basis for its determination that Delviom's price advantage was illusory. *Id.*

"The Court will uphold an agency's best value decision if it was 'coherent and a reasonable exercise' of the contracting officer's discretion." *AccelGov, LLC*, 174 Fed. Cl. at 224 (citing *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 50 (2010)). And the court must be highly deferential and presume the procurement officials acted in a rational and reasonable manner. *Id.*

DHS' best value determination was "'coherent and a reasonable exercise' of the contracting officer's discretion." *Id.* (citation omitted). The record indicates the Agency's trade-off analysis

post-corrective action was rigorous. It documented the basis for its award decision, discussed its methodology, and explained its rationale for its decision. *See generally* Tab 77. *See also AccelGov*, 174 Fed. Cl. at 232 (citing *Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 550–51 (2022)) (explaining that a reviewing court should defer to an agency's detailed and rational best value analysis). The RFQ allowed offerors to propose a staffing mix that deviated from the Government estimates, and the Agency noted Delviom's deviations in its Price Evaluation Report. Tab 15a at AR 731; Tab 35 at AR 1226–27, 1252 (determining Delviom's proposed price conformed to the RFQ). And the Solicitation warned DHS would "not make an award at a significantly higher overall price to achieve only slightly superior technical capability." Tab 15a at AR 733. The Agency exercised this option.

Plaintiff further contends DHS did not sufficiently consider SOFITC3's superior prior corporate experience. Pl.'s Mot. at 26. *See also* Tab 62 at AR 2224. SOFITC3 believed its incumbent status "gave [it] a significant competitive advantage in field [sic] of likely quoters." Pl.'s Mot. at 26. But the procurement officials both acknowledged and considered that SOFITC3 had a better Prior Corporate Experience evaluation than Delviom's quote, which was due in part to Plaintiff's status as the incumbent contractor. Tab 77 at AR 2432. And the procurement officials considered that Prior Corporate Experience was the most important technical evaluation factor. *Id.* The Agency explicitly weighed the technical factors of each proposal and considered both offerors' strengths and weaknesses cumulatively, including Delviom's staffing-related weakness. *Id.* at AR 2429–30. Ultimately, DHS determined Delviom's strengths in other aspects outweighed SOFITC3's strength under Factor 2.

And, as the procurement officials note, SOFITC3's Technical Qualifications & Approach submission contained several weaknesses. *Id.* at AR 2430. The Agency noted Plaintiff's proposal "only address[ed] a small portion of the requirement and offers no ideas relevant to most DHS system owners." *Id.* "SOFITC3's response also demonstrates a poor understanding of [***]." *Id.*

Overall, the record demonstrates the procurement officials followed the Solicitation's terms and determined Delviom's proposal's price was reasonable and the best value for DHS. *Id.* at AR 2431–32. *See also* Tab 15a at AR 736. Thus, the Agency's best value trade-off analysis was proper.

## V.    SOFITC3 Is Not Entitled to Injunctive Relief.

To receive injunctive relief, a plaintiff must first succeed on the merits of its case. *PGA, LLC v. United* States, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because SOFITC3 failed to demonstrate the Agency acted arbitrarily and capriciously here, the Court denies its request for injunctive relief.

## VI.    Conclusion

SOFITC3 failed to establish the Agency's decision to award this contract to Delviom lacked a rational basis. Thus, the Court **GRANTS** Defendant's and Defendant-Intervenor's Motions for Judgment on the Administrative Record, ECF Nos. 36 & 38. It **DENIES** Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 39. Plaintiff's Motion for Preliminary Injunction

and its Motion to Amend its Reply to that Motion are **MOOT**, ECF Nos. 30 & 44.  The Clerk is directed to enter Judgment.

      **IT IS SO ORDERED.**

                            s/ Carolyn N. Lerner
                            CAROLYN N. LERNER
                            Judge